FILED
2017 Mar-28  AM 11:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **CHERYL PETERS,** | ) | |
| | ) | |
| **CLAIMANT,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:15-CV-00684-KOB** |
| | ) | |
| **NANCY BERRYHILL** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| **RESPONDENT.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

I. INTRODUCTION

On November 4, 2011, the claimant, Cheryl Peters, protectively applied for

disability and disability insurance benefits under Title II and Title XVIII of the Social

Security Act. (R. 143). The claimant alleged disability commencing on September 9, 2011

because of aortic aneurysm, open heart surgery, paralysis in right side, limited mobility in

right arm, and high blood pressure. (R. 143, 175). The Commissioner denied the claim on

April 13, 2012. (R. 85). The claimant filed a timely request for a hearing before an

Administrative Law Judge, and the ALJ held a hearing on June 5, 2013. (R. 54).

In a decision dated August 9, 2013, the ALJ found that the claimant was not

disabled as defined by the Social Security Act and was, therefore, ineligible for social

security benefits. (R. 16-36). On October 6, 2015 the Appeals Council denied the

claimant's requests for review. (R. 1-6). Consequently, the ALJ's decision became the

final decision of the Commissioner of the Social Security Administration. The claimant

has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42

U.S.C. §§405(g) and 1383(c) (3). For the reasons stated below, this court AFFIRMS the

decision of the Commissioner.

## II. ISSUE PRESENTED

The issue before the court is whether the ALJ properly gave little weight to the

medical opinion of the claimant's treating physician, Dr. John Christopher Nichols.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court

must affirm the ALJ's decision if he applied the correct legal standards and if substantial

evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129

F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No…presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims."

*Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual

determinations *de novo*. The court will affirm those factual determinations that are

supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled,

the nature and extent of a claimant's residual functional capacity, and the application of

vocational factors, "are not medical opinions,…but are, instead, opinions on issues

reserved to the Commissioner because they are administrative findings that are dispositive

of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§

404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for

Social Security disability benefits is a question reserved for the ALJ, and the court "may

not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the

Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if

the court were to disagree with the ALJ about the significance of certain facts, the court

has no power to reverse that finding as long as substantial evidence in the record supports

it.

The court must "scrutinize the record in its entirety to determine the

reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A

reviewing court must not only look to those parts of the record that support the decision of

the ALJ, but also must view the record in its entirety and take account of evidence that

detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180

(11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d) (1) (A), a person is entitled to disability benefits when

the person is unable to "engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less

than 12 months…." 42 U.S.C. § 423(d) (1) (A). To make this determination the

Commissioner employs a five-step, sequential evaluation process:

(1)             Is the person presently unemployed?
(2)             Is the person's impairment severe?
(3)             Does the person's impairment meet or equal one of the specific
impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4)         Is the person unable to perform his or her former occupation?

(5)         Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

## V. FACTS

The claimant was fifty-seven years old at the time of the ALJ's final decision. (R. 59). The claimant has a high school education with a basic paramedic license, and past relevant work as a nurse's assistant/patient care assistant, dispatcher for the police department, and event planner. (R. 59, 79). The claimant alleges disability based on aortic aneurysm, open heart surgery, paralysis in right side, limited mobility in right arm, and high blood pressure. (R. 175).

### *Physical and Mental Impairments*

Dr. John Christopher Nichols, the claimant's primary physician at Gardendale Physician Associates, P.C., consistently evaluated the claimant's controlled hypertension every three months beginning in January 2006. Dr. Nichols continued a fluctuating Atenolol, Lisinopril, Losartan, Lasix, Klor, Amlodipine, and Micardis blood pressure regimen for chronic hypertension to stabilize her hypertension throughout seven years. (R. 221-354, 480-568).

During her routine check-up with Dr. Nichols on December 20, 2008, the claimant reported pain in her chest and back after sneezing. An x-ray indicated no fracture;

---

[1] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

however, Dr. Nichols prescribed Indocin for pain. Similarly, on July 10, 2009, Dr. Nichols ordered another set of x-rays after the claimant continued to experience chest pain. The x-ray yielded no abnormal result. Then, on January 25, 2011, the claimant underwent a bone density study, which also yielded no abnormal results. Despite sporadic pain complaints, the claimant continued her three month hypertension checkups through 2011. (R. 265-67, 273).

On August 15, 2011, Dr. Nichols ordered a chest and abdominal angiography, which showed a diffuse aneurysmal dilation of the thoracic aorta in the ascending and descending segments; however, the claimant's lungs looked clear. Subsequently, an EKG performed on August 23, 2011 at Trinity Medical Center showed no abnormalities. (R. 300, 313-14, 430).

The claimant underwent valve sparing aortic and ascending root replacement surgery on September 14, 2011 to resolve her aneurysm. For six days after surgery, doctors monitored numbness and weakness in the claimant's right upper and lower extremities. On September 21, 2011, doctors transferred the claimant to the medical floor for short-term post operative rehabilitation. Rehabilitation notes state that the claimant did well with physical and occupational therapy, and that she ambulated moderately independent. Prior to discharge, the claimant navigated twenty stairs with supervision, which was noted to be the equivalent amount of stairs at the claimant's home. (R. 389-404).

During a follow-up appointment on October 13, 2011 with Dr. Nichols, chest x-rays showed a moderate sized right pleural effusion, so Dr. Nichols recommended the claimant follow-up with her surgeon. On October 18, 2011, Dr. William Gallman at

Trinity Medical Center performed an ultrasound and removed 800cc of bloody pleural fluid. Similarly, on November 22, 2011, Dr. Gallman performed another ultrasound and removed 55cc of bloody fluid. Dr. Nichols continued to monitor the pleural effusion during check-ups in October and November, and on December 16, 2011, chest x-rays indicated that the pleural effusion was mildly smaller. (R. 302-17, 380-86).

On December 12, 2011, the claimant visited Dr. Jerry Chandler at Cardiovascular Associates, P.C. She weighed 207 pounds. Dr. Chandler encouraged the claimant to lose weight and reduce her BMI to 26 or below. (R. 217-18).

The claimant submitted a function report to the Social Security Administration on January 13, 2012. She stated that during a normal day, she eats breakfast, feeds and lets her dog out, does crafts, watches television, and reads. She attends church on Sundays and Wednesdays. She reports that she can drive a car, and drives herself to buy groceries and pick up prescriptions, and sometimes drives herself to church. Her hobbies include reading, making tied fleece blankets and crafts, watching television, volunteering at the church food bank, and doing disaster relief work. She stated that she could walk one half mile before needing rest. (R. 194-202).

On January 18, 2012, during a follow-up appointment with Dr. Nichols, the claimant reported that she was walking a mile every other day, and that she has experienced improvement in her strength and appetite. She weighed 203 pounds. Dr. Nichols noted that she had no chest pain or upper or lower extremity edema. She had decreased breath sounds on her right side; however, her respiratory efforts were normal. Then, on February 15, 2012, another chest x-ray showed that the pleural effusion had stabilized. (R. 510, 532-34).

At the Disability Determination Service's request, Dr. Marshall Kuremsky evaluated the claimant on March 3, 2012. She weighed 212 pounds. The claimant stated that she had decreased range of motion in her right shoulder and that she continued to have shortness of breath. Dr. Kuremsky noted that the claimant ambulated without difficulty, and that her lungs were clear without evidence of decreased breath sounds. Upon cardiac evaluation, Dr. Kuremsky noted a regular heart rate and rhythm; however, he stated that the claimant had trace edema in the feet and ankles. The claimant showed normal grip strength, and the range of motion in her spine and lower extremities were normal. Her upper extremities showed normal range of motion with the exception of her right shoulder. Straight leg raise testing yielded normal results, she could walk on her heels and toes, and she could squat without difficulty. She was alert and oriented, and all nerve testing was normal. Dr. Kuremsky ultimately opined that the claimant would be a candidate for light, modified, or sedentary type activity. He stated that, although they are being monitored, her aortic aneurysms prevent her from performing heavy or aggressive type of labor. Additionally, the Disability Determination Service ordered a chest x-ray from Outpatient Diagnostic Center of Birmingham performed on April 3, 2012, which yielded no abnormal results. (R. 441-46).

On April 27, 2012, the claimant visited internal specialist Dr. John Cantrell at Gardendale Physician Associates, P.C. for pain on the right side of her body. A CT scan was positive for moderate right hydroureteronephrosis (liquid inside the kidney) extending down the urinary bladder, kidney stones, and left nephrolithiasis (calculi in  the  kidney, which is the beginning stage of a kidney stone) with chronic left atrophic pyelonephritis. Dr. Cantrell prescribed Lortab for pain. (R. 488-91).

7

During a routine follow-up on June 14, 2012, the claimant weighed 201 pounds. She reported no chest pain, and all physical exams yielded normal results, but Dr. Nichols noted that the claimant still maintained right side pleural effusion, and stated that he still could not release the claimant back to work. (R. 482-85).

On July 18, 2012, the claimant visited the Trinity Medical Center emergency room for abdominal pain, urinary hesitancy, and nausea. An abdominal CT scan showed ureteral stones. Upon discharge, the emergency room doctor prescribed Percocet, Phenergan, and Cipro. (R. 449-52).

Upon Dr. Nichols' referral, the claimant visited cardiologist, Dr. John B. Casterline at Cardio-Thoracic Surgeons, P.C. in August 2012. After the visit, Dr. Casterline wrote a letter to the claimant's primary physician, Dr. Nichols, with concerns about the claimant's visit. First, Dr. Casterline explained that a CT scan showed a nice homogenous ascending aorta and normal sized descending thoracic aorta and abdominal aorta. He noticed perhaps some minimal right-sided effusion, but noted clear lung fields. Despite the normal results, the claimant felt dyspneic (difficulty breathing often associated with lung abnormalities). Dr. Casterline expressed that he did not know why the claimant felt that way, as she showed good cardiac function. Second, Dr. Casterline noted the claimant's limited right shoulder abduction, and stated that he cannot explain the limitation. Although the claimant stated that her range of motion was improving, she continued to be limited to ninety degrees. Dr. Casterline suggested the claimant see a pulmonologist for further evaluation. (R. 478).

On September 11, 2012, during a routine check-up with Dr. Nichols, the claimant explained that she visited a pulmonologist, but could not tolerate the medication

8

prescribed.[2] She weighed 199 pounds. The claimant also complained of pain and weakness on her right side and trouble moving her right shoulder. Cardiovascular, constitutional, gastrointestinal, respiratory, and neck physical exams yielded normal results. Dr. Nicholas noted abnormal right side weakness during a neurological exam, and abnormal crying during a psychiatric exam. He referred the claimant to neurologist Dr. Rodney K. Swillie, and prescribed Sertraline for depression, Asmanex for asthma, and recommended that the claimant continue all other medications. (R. 494-97).

At Dr. Nichols' request, the claimant underwent an EKG at Trinity Medical Center on October 19, 2012, which showed normal left ventricular systolic function, 55-60% estimated left ventricular ejection fraction, and a normal aortic valve with tricuspid configuration. The claimant showed trace mitral regurgitation, trace tricuspid regurgitation, trace aortic regurgitation, trace pulmonic valvular regurgitation, and mild to moderate valvular aortic stenosis. (R. 569-70).

On November 6, 2012, the claimant visited Dr. Swillie at Imagesouth Montclair Road. She weighed 214 pounds. A brain MRI, brain MRA, brain WO, and neck MRA yielded normal results. During a physical exam, the claimant showed regular heart rhythm and rate without a gallop, and clear and regular respirations. A neurological examination showed no aphasia, apraxia or agnosia, and normal cranial nerves; however, she did have a right hemiparesis and decreased motor movement. Dr. Swillie opined that the claimant experienced a cerebrovascular event during her aortic root aneurysm repair. (R. 577-82).

During a routine check-up with Dr. Nichols on December 11, 2012, the claimant stated that she just returned from a mission trip to New York. She weighed 212 pounds. She had no chest pain complaints. She had shortness of breath, and Dr. Nichols noted

---

[2] The appeal record does not contain medical records from the pulmonology visit.

dyspnea on exertion. During a cardiovascular examination, Dr. Nichols detected auscultation of a heart murmur, and abnormally high blood pressure noted as greater than 130/86. A respiratory test yielded no abnormalities. (R. 599-602).

On January 31, 2013, Dr. Nichols wrote a letter to the claimant's attorney in support of her application for disability benefits. After summarizing her past medical history, Dr. Nichols opined that the claimant should not work in any environment that would require excessive lifting or straining in an effort to protect damage caused by elevated blood pressure. In conclusion, Dr. Nichols suggested that the claimant's disability is caused by aortic repair, the stroke that occurred around the time of the surgery, and from pulmonary scarring occurring as a result of recurrent pleural effusions incited by surgery. (R. 583).

During another routine check-up with Dr. Nichols on March 11, 2013, the claimant complained of pain in her shoulders and legs. She asked for a pain medication less addictive than Lortab; however, Dr. Nichols continued Lortab for the claimant's kidney stones.  All cardiovascular examinations were normal, but Dr. Nichols noted joint pain, muscle cramping, muscle tenderness, and stiffness of joints during a musculoskeletal examination, and abnormal right leg jerks during a neurological exam. Similarly, the respiratory exam revealed dyspnea on exertion. (R. 615-18).

Dr. Nichols wrote another letter on April 12, 2013 regarding the claimant's disability status. He opined that the claimant has been and continues to be totally and completely disabled after a complicated thoracic aortic replacement surgery. (R. 585).

During another routine check-up with Dr. Nichols on May 14, 2013, the claimant reported that she has been okay. She weighed 227 pounds. She reported no chest pain, and

all cardiovascular examinations were normal. Her blood pressure was high, and a musculoskeletal exam showed abnormal pain in the claimant's legs and arms. Her respiratory tests continued to show dyspnea on exertion. (R. 622-26).

On May 23, 2013, the claimant visited optometrist Dr. John S. Owen for an eye examination. The claimant complained that she saw cloudy spots when she blinks.[3] She showed visual acuity of 20/20 in her right eye and 20/30+ in her left eye. Dr. Owen diagnoses the claimant with lattice degeneration of peripheral retina. (R. 631-36).

*The ALJ Hearing*

At the hearing on June 5, 2013, the claimant testified that she is not sick, but constantly coughs because of aneurysms and decreased lung function. She stated that doctors diagnosed her with an abdominal aneurysm and three heart aneurysms that required surgery. After surgery, the claimant recalled that her right side was paralyzed and had fluid in her right lung. She continues to have pain in her right side and shortness of breath since the surgery. She testified that the pain continues to radiate and burn through her chest and down her leg when she walks. She also explained that she holds her arm in a curled position at all times, as that position is more comfortable. (R. 58-61, 74).

The claimant further testified that she tries to walk with her neighbor three times a week, but she can only walk half-a-block before she needs a break. She stated that she can only stand in one spot for approximately fifteen minutes without moving around. Similarly, if she sits for too long, she has a difficult time getting up and walking again. She testified that doctors told her that nerve damage caused her leg pain. (R. 61-63).

---

[3] The May 23, 2013 medical record suggests OD cataract surgery on May 27, 2009 and OS cataract surgery on April 29, 2009; however, the appeal record does not include a medical record reflecting those surgeries. (R. 631).

When asked about her vision problems, the claimant testified that her vision is blurry, and that doctors diagnosed her with lattice degeneration of the peripheral retina. She further testified that her vision in both eyes has improved since cataract surgery in 2009. (R. 63, 75).

The claimant testified that she lives at home alone with her dog. She does have a driver's license, and frequently drives herself to church or to buy groceries. She states that she has not worked since September of 2011, and has no source of income. She explained that her church and friends support her financially in addition to receiving food stamps. (R. 64-67).

When asked about pain, the claimant testified that it has progressively felt worse since the surgery. She stated that she has developed a limp, and cannot stand for very long. She also explained that doctors have drained her lungs three times, yet she still experiences shortness of breath. She also stated that she experiences difficulty lifting a gallon of milk with her right arm. She testified that walking, using her arm, and other activity worsens the pain. For example, she has difficulty climbing four stairs at her friend's house. (R. 67-70).

The claimant testified that she worked at an assisted living facility where she helped patients in and out of bed, bath, and off the floor if they fell. She testified that she also worked as a patient care tech in a hospital, where she drew blood and assisted in bathing patients. The claimant also testified that she worked as an office service specialist at the University of Alabama at Birmingham, where she planned events for incoming students. She stated that she worked very closely with students, and did not use computers often. (R. 71, 73, 78).

When asked about current medication, she testified that she is currently taking Neurontin and Lortab.[4] She stated that she has been taking Neurontin for approximately four months. She stated that both medications make her vision blury and puts her to sleep. She stated that she requested different, less addictive, pain medication, but Dr. Nichols did not oblige. (R. 72-73).

The claimant explained that a typical day consists of waking up at six in the morning and laying in bed until she gets out of bed at seven. Then, she uses the bathroom and feeds and lets her dog outside. She stated that sometimes she would make herself cereal or toast for breakfast. She explained that she walks to check her mailbox every day; however, about three times a week she will walk outside with her neighbor. On days she walks with her neighbor, she stated that they would walk down the street. She testified that she had to stop frequently when walking, and had to take pain medication immediately after returning home, which would put her to sleep. She also testified that if she has the opportunity to write, she can only write for approximately ten minutes before pain in her right shoulder and chest require her to stop writing. She testified that she tries to wash dishes, but can only get through one or two before she has to sit and breathe. (R. 63-64, 73-76).

A vocational expert, Ms. Norma-Jill Jacobson, testified concerning the type and availability of jobs that the claimant was able to perform. Ms. Jacobson testified that the claimant's past relevant work was as a nurse's assistant/patient care assistant, dispatcher for the police department, and event planner. Ms. Jacobson classified the nurse's assistant/patient care position as heavy and semiskilled work; the dispatcher position as sedentary and semiskilled work; and the event planner position as medium and

---

[4] The record does not indicate which doctor prescribed Neurontin.

semiskilled work. (R. 79).

The ALJ asked Ms. Jacobson to assume that a hypothetical individual with the same age, education, and work experience as the claimant is limited to medium work with no climbing; occasional stooping or crouching; and no right arm pushing or pulling or overhead reaching. The ALJ asked Ms. Jacobson if, other than the claimant's previous work, other jobs existed in the region or nation that the individual could perform. Ms. Jacobson replied that the hypothetical individual could perform work as a fast food worker, classified as medium exertion, with approximately 1,000 jobs in Alabama and 229,000 jobs in the nation; a cashier, classified as medium exertion, with approximately 2,900 jobs in Alabama and 130,000 jobs in the nation; and a packer, classified as medium exertion, with approximately 1,500 jobs in Alabama and 240,000 in the nation. (R. 80-81).

The ALJ then changed the work limitation to light work, and asked if any jobs would be available. Ms. Jacobson testified that the hypothetical individual could perform work as a retail sales clerk, classified as light work, with approximately 3,000 jobs in Alabama and 105,000 jobs in the nation; "service at light,"[5] classified as light work, with approximately 2,300 jobs in Alabama and 260,000 in the nation; and product inspector, classified as light work, with approximately 3,000 jobs in Alabama and 107,000 in the nation. (R. 81).

The ALJ then changed the work limitation to sedentary work, and asked if any jobs would be available. Ms. Jacobson testified that the hypothetical individual could perform work as a cashier, classified as sedentary work, with approximately 2,000 jobs in Alabama and 31,000 jobs in the nation; an automatic machine tender, classified as sedentary work, with approximately 1,000 jobs in Alabama and 31,000 in the nation; and

---

[5] The record does not further define this position.

an information/interview clerk, classified as sedentary work, with approximately 1,700 jobs in Alabama and 100,000 in the nation. (R. 81).

The ALJ then asked if the hypothetical individual described above could perform any of the claimant's past work. Ms. Jacobson replied that the hypothetical individual could perform work as a dispatcher.  (R. 81).

Again, the ALJ added an additional limitation of no crouching and no stooping, and asked if that hypothetical person could perform work as a dispatcher. Ms. Jacobson testified that the hypothetical individual could perform work as a dispatcher, even if limited to medium, light, or sedentary work. (R. 82).

### The ALJ's Decision

On August 9, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since her September 9, 2011 alleged onset date. (R. 22).

Next, the ALJ found that the claimant had the severe impairments of status post aortic aneurysm surgery; decreased motion of the right shoulder; hypertension; and obesity. The ALJ found the claimant's alleged cataracts to be non-severe after reviewing Dr. Owen's complete eye examination results on May 23, 2013. The ALJ explained that the claimant alleged no visual limitations, and that the medical evidence in the record established no functional limitation resulting from a visual condition. (R. 27).

Similarly, the ALJ stated the discussion of the claimant's depression was only evident in a single isolated office visit, and the claimant did not report any further mental

symptoms. Additionally, the ALJ explained that although her primary physician maintained the claimant on psychotropic medication, no additional problems or side effects are evident in the record. (R. 27).

The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ explained that the evidence in the record does not contain any diagnostic findings, signs, symptoms, or laboratory results that meet or equal any of the listed impairments. (R. 27).

Next, the ALJ determined that the claimant has the residual functional capacity to perform sedentary work that allows for no climbing, stooping, or crouching; and no pushing, pulling, or overhead reaching with her right arm. (R. 16).

In making this finding, the ALJ considered the claimant's symptoms and the corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause her symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully credible when compared with the evidence. (R. 28).

First, the ALJ considered the claimant's subjective evidence in light of the objective medical evidence noted in the record. The ALJ explained that, although the claimant testifies that she cannot work because of pain and weakness affecting her right side, other subjective evidence and objective clinical findings do not corroborate her allegations. First, in 2012, the claimant had normal grip strength in her upper and lower extremities and normal range of motion in all extremities other than slight decreased range of motion in her right shoulder. A right shoulder x-ray illustrated no bone or joint

abnormality. (R. 29).

Then, the ALJ expressly rejected Dr. Nichols' opinion that the claimant is disabled because the great weight of the evidence does not support the opinion, and because conclusory opinions regarding the claimant's disability are solely reserved for the ALJ. The ALJ states that the record does not support the claimant's lung weaknesses, as the claimant has consistently demonstrated normal respirations, and no recurrence of pulmonary effusion since March 2012. Similarly, although doctors have diagnosed the claimant with hypertension, the objective evidence demonstrates that the hypertension is controlled, and that the claimant has reported no adverse side effects from her hypertension medication. Furthermore, the claimant does not have any cardiac problems or organ damage caused by uncontrolled hypertension, and the record consistently reflects no edema of the extremities. Finally, the ALJ stated that the claimant's obesity does not affect the claimant's ability to perform routine movement and necessary physical activity within the work environment. Furthermore, the ALJ found that the claimant does not allege any limitation because of obesity. Instead, the ALJ looked to Dr. Kuremsky's opinion that the claimant could perform light or sedentary type activity when determining that the weight of the evidence fails to support the degree of disabling pain and limitations asserted. (R. 30-31).

Finally, the ALJ, relying on the vocational expert's testimony, found that the claimant is capable of performing past relevant work as a dispatcher, as a dispatcher does not require work related activities precluded by her residual function capacity. The ALJ ultimately found the claimant not disabled. (R. 31).

## VI. DISCUSSION

The claimant argues that the ALJ improperly discredited treating physician Dr. Nichols' medical opinion that the claimant is totally and completely disabled. To the contrary, this court finds that the ALJ applied the appropriate legal standards in the weight he gave to Dr. Nichols, and substantial evidence supports the ALJ's findings.

The ALJ must accord the opinions of a treating physician substantial or considerable weight unless *good cause* is shown to the contrary. *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1998). Good cause exists if evidence does not support the physician's opinion; the evidence supports a contrary finding; the opinion is conclusory; or the opinion is inconsistent with his own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004); 20 C.F.R. § 416.927. The ALJ may not substitute his judgment for the judgment of a physician or draw his own conclusions about the claimant's medical records. *Hillsman v. Bowen*, 804 F.2d 1179, 1182 (11th Cir. 1986). Where the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight and substantial evidence supports those reasons, the ALJ commits no reversible error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005).

The ALJ gave two reasons for rejecting Dr. Nichols' opinion in his April 12, 2013 letter that the claimant was totally and completely disabled: 1) the evidence in the record does not support such a finding; and 2) Dr. Nichols' opinion was conclusory and an issue reserved for the ALJ to decide. To show that evidence does not support a disability finding, the ALJ explained that, regarding her alleged breathing issues, the claimant consistently demonstrated normal respirations, and the record showed the last pulmonary

effusion was in 2012.[6] Additionally, the ALJ conceded that the claimant suffered from hypertension; however, he explained that medication controls the claimant's hypertension, and the record reflects no adverse side effects from her medication. Finally, the ALJ explained that the claimant's obesity does not limit her ability to work or perform routine movement. The ALJ correctly found that the record does not support Dr. Nichols' opinion. (R. 30-31).

The court also agrees with the ALJ's finding that Dr. Nichols' April 12, 2013 opinion is conclusory. The Social Security Administration and subsequent case law make clear that the ALJ must determine the ultimate issue of disability, not a physician. The ultimate issue of disability is left to the determination of the Social Security Commissioner and the statement by a medical source that a claimant is "disabled" is not binding. 20 C.F R. § 404.1527 (e). Furthermore, statements made by Dr. Nichols that the claimant is totally and completely disabled are not binding. *See e.g.*, *Jones v. Dep't of Health and Human Serv.*, 941 F.2d 1529, 1532-33 (11th Cir. 1991) (discrediting a treating physician's conclusory opinion that the claimant was disabled after the treating physician previously conducted a physical capacity examination and opined that the claimant could perform sedentary work). Because Dr. Nichols' April 12, 2013 opinion did not state specific medical reasons to support his opinion that the claimant is completely and totally disabled, good cause existed for the ALJ to discredit Dr. Nichols' April 12 opinion and form his own disability opinion. (R. 585).

---

[6] The ALJ stated that the claimant consistently demonstrated normal respirations, and has experienced no recurrence of pulmonary effusions since March 2012; however, Dr. Nichols discussed a pulmonary effusion on June 14, 2012. (R. 482). Although the ALJ's assertion regarding the date is incorrect, substantial evidence still supports his ultimate finding.

The court further notes that the ALJ did not fully discredit Dr. Nichols' general medical opinion, or substitute his own medical opinion for that of Dr. Nichols'. In his letter to the claimant's counsel on January 31, 2013, Dr. Nichols stated that the claimant should not return to her previous job as a nursing assistant, or work in any environment that would require excessive lifting or straining. Between the January 31 and April 12, 2013 letters, the claimant only attended one doctor's appointment. During her routine check-up on March 11, 2013, the claimant's symptoms were consistent with symptoms she regularly reported since September 2011. Nothing exists in the intervening medical record that supports a change from only a heavy lifting restriction to total disability, and the ALJ incorporated Dr. Nichols' initial restrictions in the residual functional capacity finding.  (R. 583-85, 615-18).

The court finds that the ALJ applied the proper legal standards in discrediting Dr. Nichols' April 12 opinion, and substantial evidence supports the ALJ's decision.

## VII. CONCLUSION

For the reasons stated above, the court AFFIRMS the decision of the Commissioner.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 28th day of March, 2017.


_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE